<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

|  |  |
|---|---|
| CARMEN DIAZ, | HONORABLE KAREN M. WILLIAMS |
| *Plaintiff,* | Civil Action<br>No. 24-283 (KMW-EAP) |
| v. | |
| CITY OF VINELAND, VINELAND POLICE DEPARTMENT, KENNETH A. FARMER, John Doe I-V and/or XYZ Corporations, *jointly, severally, and in the alternative,* | **OPINION** |
| *Defendants.* | |

APPEARANCES:

**MICHAEL J. MACKLER, ESQ.**
GOLDBERG, MACKLER, SAYEGH, MINTZ,
PFEFFER, BONCHI & GILL, PC
1030 ATLANTIC AVENUE
ATLANTIC CITY, NJ 08401

    *Attorney for Plaintiff*

**JOSEPH D. CLIFFORD, ESQ.**
**WILLIAM F. COOK, ESQ.**
**RYAN KELLY, ESQ.**
BROWN & CONNERY
360 HADDON AVENUE
WESTMONT, NJ 08108

    *Attorneys for Defendants*

**WILLIAMS, District Judge:**

## I.   INTRODUCTION

Plaintiff Carmen Diaz ("Plaintiff") brings this action against Defendants City of Vineland (the "City"), the Vineland Police Department ("VPD"), and Vineland Police Officer Kenneth Farmer ("Officer Farmer") (collectively, "Defendants"), asserting claims arising from Officer Farmer's use of force during the officers' response to a domestic disturbance at Plaintiff's residence on March 22, 2023. Plaintiff alleges that Officer Farmer violated her rights under the Fourth Amendment to the United States Constitution, actionable pursuant to 42 U.S.C. § 1983, as well as the New Jersey Constitution and New Jersey common law. Plaintiff further asserts municipal liability claims against the City and VPD arising from the same incident. (Compl., Dkt. No. 1.)

This matter comes before the Court upon Defendants' Motion for Summary Judgment ("MSJ"). (Dkt. No. 54.) Plaintiff opposes the motion (Dkt. No. 55), and Defendants have filed a reply. (Dkt. No. 58.) The Court has carefully reviewed the parties' submissions, including the body-worn camera recordings, deposition testimony, expert reports, and statements of material facts submitted pursuant to Local Civil Rule 56.1. Pursuant to Local Civil Rule 78.1, the Court decides the motion without oral argument.

The central issue presented is whether Officer Farmer violated the Fourth Amendment when, during an active struggle with an emotionally disturbed person whom he was attempting to control, he moved Plaintiff away after Plaintiff tried to intervene in the encounter. For the reasons set forth below, the Court concludes that, viewing the evidence in the light most favorable to Plaintiff and considering the encounter in its totality, Officer Farmer's use of force was objectively reasonable under the circumstances. Even assuming a constitutional violation could be found, Officer Farmer would nevertheless be entitled to qualified immunity because Plaintiff has

2

identified no clearly established law that would have placed every reasonable officer on notice that such conduct violated the Fourth Amendment under the circumstances presented here.

For the reasons that follow, Defendants' Motion for Summary Judgment will be **GRANTED**.

II.    **FACTUAL BACKGROUND**

a.    **The March 22, 2023 Domestic Disturbance**

On the evening of March 22, 2023, at approximately 11:17 p.m., Vineland Police Officers Kenneth Farmer and Heitel Mora were dispatched to 220 West Plum Street in Vineland, New Jersey, in response to a report of an emotionally disturbed person ("EDP"). According to the Computer Aided Dispatch ("CAD") report, the caller reported that an individual at the residence was arguing with her boyfriend, cutting herself with a knife, and threatening suicide. (Defs.' Statement of Undisputed Material Facts ("DSUMF") ¶ 1, Dkt. No. 54-2; Cook Cert., Ex. D-1.)

When Officers Farmer and Mora arrived, they found the front door standing open. (DSUMF ¶ 2.) After announcing themselves as police officers and receiving no response, they entered the residence to investigate the reported emergency. (*Id.* ¶¶ 3-4.) Inside, the officers observed broken glass scattered across the floor and puncture marks in a bedroom door that they believed may have been caused by a knife. (*Id.* ¶ 5.) Consistent with those observations, Officer Farmer briefly drew his department-issued conducted energy device ("CED") while assessing whether an immediate threat existed but reholstered it once he determined no imminent threat was present in the area immediately before him. (*Id.* ¶ 7 (citing Farmer Police Report, Cook Cert., Ex. D-3).)

The officers first encountered Plaintiff Carmen Diaz, who informed Officer Mora that her daughter, Eugenia Diaz, suffered from mental health issues and had caused the damage to the

3

bedroom door. As Officers Farmer and Mora continued toward the rear of the residence to investigate, they heard movement and voices coming from the kitchen and adjoining bedrooms. (*Id.* ¶¶ 7-8.)

### b. The Officers' Response to the Escalating Disturbance

The situation rapidly escalated after the officers entered the rear portion of the residence. Officer Mora encountered Marcelino Santiago, who was asleep in a bedroom adjoining the kitchen. After awakening, Santiago—appearing intoxicated—became argumentative and repeatedly questioned why the officers had entered the residence, requiring Mora to direct his attention toward Santiago while attempting to explain the officers' presence. (*Id.* ¶ 8.)

At approximately the same time, Officer Farmer encountered Eugenia Diaz near the kitchen. The body-worn camera recordings depict Eugenia emerging from the rear of the residence screaming at Officer Farmer and refusing his repeated attempts to identify himself and determine whether she needed assistance. As Officer Farmer attempted to calm the situation, Eugenia continued yelling, repeatedly directed racial slurs toward him, advanced into his personal space, and intentionally chest-bumped him. (*Id.* ¶¶ 6-8.)

Following the chest bump, Officer Farmer advised Eugenia that she was being detained and attempted to take her into custody. By that point, however, Officer Mora remained occupied with Santiago, who was moving toward the officers while Officer Farmer attempted to control Eugenia. Mora began assisting Officer Farmer only after first directing Santiago to stay back and then helped restrain Eugenia as she resisted the officers' efforts to handcuff her. During the ensuing struggle, Eugenia pulled away from the officers' control, continued resisting, and kicked broken glass across the kitchen floor, ultimately injuring herself in the process. She also kicked Officer Mora as the officers attempted to secure her in handcuffs. (*Id.* ¶ 8.) Meanwhile, Santiago can be

4

seen approaching Mora and Farmer while they are engaged with Eugenia. It is apparent that before Plaintiff entered the immediate encounter with Officer Farmer, the circumstances confronting the responding officers included a reported suicidal EDP believed to have possessed a knife, a residence containing broken glass and apparent knife damage, an actively resisting and increasingly combative subject, and a second civilian whose conduct required Officer Mora's attention while Officer Farmer attempted to effectuate Eugenia's arrest. The events that followed—including Plaintiff's interaction with Officer Farmer—occurred during that ongoing effort to bring Eugenia under control.

### c. Plaintiff's Physical Intervention

As Officer Farmer attempted to detain Eugenia, Plaintiff walked from the front portion of the residence into the kitchen area where the encounter was unfolding. The body-worn camera recordings depict Plaintiff approaching Officer Farmer while he remained engaged with Eugenia and standing near both individuals as Officer Farmer continued his efforts to control Eugenia and place her in handcuffs. (DSUMF ¶ 6; Cook Cert., Exs. D-2, D-10.)

The parties disagree about certain aspects of Plaintiff's conduct during these events. Defendants contend that Plaintiff physically interfered with Officer Farmer's attempt to arrest Eugenia by approaching Officer Farmer from his right side, placing her hands on him, and attempting to move him away from Eugenia. (DSUMF ¶¶ 7, 11; Farmer Police Report; Cook Cert., Ex. D-7, Internal Affairs Investigation Report at 23.) Plaintiff, by contrast, maintains that she did not pose a threat to Officer Farmer and did not intentionally obstruct the arrest. (Pl.'s Response to DSUMF ("RUMF") ¶¶ 7, 11; Garrels Rep. at 29, 40-42, Dkt. No. 55-6.) Regardless of Plaintiff's motivation, the body-worn camera recordings depict Plaintiff repeatedly tapping Officer Farmer while he was simultaneously attempting to restrain Eugenia.

5

At the same time, Officer Mora was engaged in assisting with Eugenia and monitoring Santiago, who had left the room he was in and moved toward the kitchen area where the officers, Eugenia, and Plaintiff were. As Officer Farmer continued attempting to secure Eugenia, he directed Plaintiff to "Move" while extending his arm toward Plaintiff. The encounter was instantaneous with the command and appears almost incidental. Officer Farmer, with a single fleeting motion, physically displaces Plaintiff away from the immediate area of arrest, then Plaintiff fell to the kitchen floor. The officers then continued their efforts to restrain Eugenia, who remained actively resistant before she was ultimately placed in handcuffs. (DSUMF ¶¶ 6-8; Cook Cert., Exs. D-2, D-10.)

Following the arrest, emergency medical assistance was requested for Plaintiff. Plaintiff was never arrested or charged with any offense arising from the incident. Eugenia, by contrast, was charged with, among other offenses, aggravated assault on a law enforcement officer and resisting arrest. (DSUMF ¶ 8.)

### d. Plaintiff's Injuries

Plaintiff was transported from the residence to Inspira Medical Center for evaluation and treatment. Imaging performed shortly after her arrival revealed a subcapital fracture of the right femoral neck. Plaintiff subsequently underwent surgical repair of the fracture and participated in both inpatient rehabilitation and outpatient physical therapy. (Anapolle Rep. at 1-2, Dkt. No. 55-7; Garrels Rep. at 16.)

Plaintiff's orthopedic expert, Dr. David Anapolle, opines that Plaintiff sustained a displaced fracture of the right hip, together with additional lumbar injuries, and that those injuries were causally related to the March 22, 2023 incident. (Anapolle Rep. at 3-4.) Defendants do not dispute, for purposes of the present motion, that Plaintiff suffered significant injuries as a result of her fall.

6

Rather, the parties' dispute centers on whether Officer Farmer's use of force under the circumstances violated Plaintiff's constitutional or state-law rights.

### e.  Procedural History

Plaintiff commenced this action on January 17, 2024, by filing a Complaint against the City of Vineland, the Vineland Police Department, Officer Kenneth Farmer, and fictitious defendants, alleging violations of "the Federal Constitution, New Jersey Constitution, and statutory and common laws of the State of New Jersey" (Count I); a claim pursuant to 42 U.S.C. §§ 1983 and 1988 (Count II); a *Monell*[1] claim (Count III); and a vicarious liability claim (Count IV) arising from the events of March 22, 2023. (Compl., Dkt. No. 1.)

Following the close of discovery, Defendants City of Vineland, the Vineland Police Department, and Officer Farmer moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Defs.' MSJ.) In support of their motion, Defendants submitted, among other things, the body-worn camera recordings from Officers Farmer and Mora, the officers' police reports, deposition testimony, the Internal Affairs investigation, and the expert report of Michael K. Lynch. (Dkt. Nos. 54-2 through 54-12.)

Plaintiff opposes the motion, relying on the body-worn camera recordings, deposition testimony, the expert report of police practices expert James Garrels, and the orthopedic expert report of Dr. David Anapolle. (Pl.'s Opp.; Garrels Rep.; Anapolle Rep.) Defendants thereafter filed a reply in further support of their motion. (Defs.' Reply.)

The motion is fully briefed and ripe for disposition.

---

[1] *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978).

7

III. **LEGAL STANDARD**

### a. Summary Judgment

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met that burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts" and instead "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (quoting Fed. R. Civ. P. 56(e)).

In considering a motion for summary judgment, the Court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Anderson*, 477 U.S. at 255. Where, as here, the record includes video evidence of the events in question, the Court ordinarily views the facts in the light most favorable to the nonmoving party. However, the Court need not adopt a version of events that is "blatantly contradicted by the record, so that no reasonable jury could believe it." *Scott v. Harris*, 550 U.S. 372, 380 (2007). Instead, when a video recording "quite clearly contradicts the version of the story told by" the nonmoving party, the Court should view the facts "in the light depicted by the videotape." *Id.* at 378-81; *see also El v. City of Pittsburgh*, 975 F.3d 327, 336 (3d Cir. 2020) (applying *Scott* and relying on body-worn camera footage at summary judgment).

8

### b. Fourth Amendment Excessive Force

Claims that law enforcement officers used excessive force during an arrest, investigatory stop, or other seizure are analyzed under the Fourth Amendment's objective reasonableness standard. *Graham v. Connor*, 490 U.S. 386, 388, 395 (1989). The inquiry is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. Because "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," courts must carefully evaluate "the facts and circumstances of each particular case." *Id.* at 396.

Objective reasonableness is assessed "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* The analysis "must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97. Accordingly, the Court must consider the totality of the circumstances confronting the officer at the time force was used. *Santini v. Fuentes*, 795 F.3d 410, 417 (3d Cir. 2015).

In addition to the factors identified in *Graham*, the Third Circuit has instructed courts to consider other relevant circumstances, including "the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time." *Sharrar v. Felsing*, 128 F.3d 810, 822 (3d Cir. 1997), *abrogated on other grounds by Curley v. Klem*, 499 F.3d 199 (3d Cir. 2007); *see also El*, 975 F.3d at 336-37 (reaffirming the continued relevance of the *Sharrar*

9

factors). No single factor is dispositive; rather, the Court must evaluate the officer's conduct considering the totality of the circumstances known to the officer at the moment force was employed. *Santini*, 795 F.3d at 417; *Graham*, 490 U.S. at 396 ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, . . . violates the Fourth Amendment.").

### c. Qualified Immunity

The doctrine of qualified immunity shields government officials performing discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.*

In determining whether qualified immunity applies, courts consider two questions: (1) whether the facts, viewed in the light most favorable to the plaintiff, establish the violation of a constitutional right; and (2) whether that right was "clearly established" at the time of the challenged conduct. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Courts may address these questions in either order. *Pearson*, 555 U.S. at 236.

The Supreme Court has repeatedly cautioned that clearly established law "must not be defined at a high level of generality." *White v. Pauly*, 580 U.S. 73, 79 (2017). Instead, the inquiry "must be undertaken in light of the specific context of the case." *Saucier*, 533 U.S. at 201. Thus, although a case directly on point is not invariably required, existing precedent must have placed the constitutional question "beyond debate." *White*, 580 U.S. at 79 (quotation omitted).

10

These principles have particular force in Fourth Amendment excessive force cases, where "it is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quotation omitted). Accordingly, the Supreme Court has repeatedly reversed denials of qualified immunity where lower courts relied on generalized excessive-force principles rather than precedent addressing materially similar circumstances. *See Kisela v. Hughes*, 584 U.S. 100, 104-06 (2018); *City of Tahlequah v. Bond*, 595 U.S. 9, 12-13 (2021); *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5-8 (2021). The dispositive inquiry is whether existing precedent gave the officer "fair notice" that the challenged conduct was unlawful under the particular circumstances confronting him. *Kisela*, 584 U.S. at 104.

## IV.    DISCUSSION

Plaintiff's excessive force claim largely examines Officer Farmer's interaction with Plaintiff in isolation. However, the Fourth Amendment requires the Court to evaluate the objective reasonableness of an officer's use of force in light of the totality of the circumstances confronting the officer at the moment force was employed. *Graham*, 490 U.S. at 396. Those circumstances included an ongoing struggle with an actively resisting emotionally disturbed person, the presence of multiple emotionally charged civilians inside a confined residence, and the fact that the second responding officer was simultaneously occupied addressing another escalating confrontation while assisting in the effort to secure Eugenia Diaz. When viewed in that broader context, the Court concludes that Officer Farmer's use of force was objectively reasonable under the Fourth Amendment. Moreover, even assuming a constitutional violation could be found, Officer Farmer would independently be entitled to qualified immunity because Plaintiff has identified no clearly

11

established law that would have placed every reasonable officer on notice that the conduct at issue violated the Fourth Amendment under the particular circumstances presented here.

### a. The Body-Worn Camera Recordings Govern the Court's Factual Analysis to the Extent They Plainly Depict the Encounter

As a threshold matter, the parties dispute certain aspects of the events leading to Plaintiff's fall, including the nature of Plaintiff's interaction with Officer Farmer and whether Plaintiff's conduct justified the force used against her. Because the encounter was captured on the body-worn cameras worn by Officers Farmer and Mora, the Court begins by determining what facts are established by those recordings before turning to the constitutional analysis.

Ordinarily, at summary judgment, the Court must accept the nonmovant's version of the facts and draw all reasonable inferences in her favor. *Anderson*, 477 U.S. at 255. That principle, however, does not require a court to adopt a factual account that is "blatantly contradicted by the record, so that no reasonable jury could believe it." *Scott*, 550 U.S. at 380. Rather, where video evidence "quite clearly contradicts the version of the story told by" a party, a court should view the facts "in the light depicted by the videotape." *Id.* at 378-81. The Third Circuit has repeatedly applied *Scott* in cases involving body-worn camera footage, recognizing that objective video evidence may resolve factual disputes where the recordings clearly depict the events at issue. *See El*, 975 F.3d at 336-37; *Williams v. City of York*, 967 F.3d 252, 259-60 (3d Cir. 2020).

Here, the body-worn camera recordings do not resolve every factual disagreement between the parties. For example, the recordings do not definitively establish Plaintiff's subjective intent in approaching Officer Farmer, nor do they resolve whether Plaintiff acted out of concern for her daughter or with any intent to obstruct the officers. However, the recordings do plainly depict several facts that are central to the Court's analysis. They show that, immediately before Officer Farmer pushed Plaintiff, he was actively attempting to arrest Eugenia after she had repeatedly

12

screamed at him, advanced toward him, and physically chest-bumped him. The recordings further depict Plaintiff approaching Officer Farmer while that struggle remained ongoing, repeatedly tapping his forearm as he attempted to control Eugenia, and remaining within the immediate area of the arrest as Officer Farmer simultaneously attempted to restrain Eugenia and monitor the rapidly evolving situation. The recordings likewise show that Officer Mora's attention was divided between assisting with Eugenia's arrest and addressing Marcelino Santiago, who had approached the officers during the encounter, leaving Officer Farmer to contend simultaneously with Eugenia's continued resistance and Plaintiff's physical engagement. Finally, the recordings depict Officer Farmer directing Plaintiff to "Move" immediately before using a single push to create separation between Plaintiff and the ongoing arrest, after which the officers continued their efforts to restrain Eugenia.

To be sure, the parties offer competing interpretations of what those events signify. Plaintiff contends that she posed no threat and did not interfere with Officer Farmer's efforts. (*See* Pl.'s Supplemental Statement of Undisputed Material Facts ("SSUMF") ¶ 45.) Defendants contend that Plaintiff physically interfered with an active arrest and created an immediate officer-safety concern. (DSUMF ¶ 15.) Those competing characterizations present the ultimate legal question before the Court. But they do not alter what the recordings themselves depict. Accordingly, the Court accepts Plaintiff's version of the facts except where it is plainly contradicted by the body-worn camera recordings. *See Scott*, 550 U.S. at 380-81; *El*, 975 F.3d at 336-37.

13

        **b. Officer Farmer's Use of Force Was Objectively Reasonable Under the Totality of the Circumstances.**

        *i. Plaintiff's subjective motivation does not alter the Fourth Amendment inquiry.*

Before addressing the circumstances confronting Officer Farmer, the Court first addresses Plaintiff's contention that she was not attempting to interfere with Officer Farmer's efforts to control the situation.

The Supreme Court has made clear that excessive force claims are evaluated under an objective standard that is "without regard to [the officer's] underlying intent or motivation." *Graham*, 490 U.S. at 397. Accordingly, the relevant question is not why Plaintiff was tapping Officer Farmer, but what a reasonable officer in Officer Farmer's position could objectively perceive while attempting to arrest an actively resisting individual during a rapidly unfolding confrontation. *See id.* at 396-97. Thus, although Plaintiff's motive may have been protective rather than aggressive, her subjective intent does not control the constitutional analysis.

        *ii. The totality of the circumstances confronting Officer Farmer justified the limited use of force.*

Considering the circumstances confronting Officer Farmer at the moment force was employed, the Court concludes that his conduct was objectively reasonable.

Unlike many excessive force cases involving force used on a suspect after he or she has been secured, this case arose amid an ongoing attempt to arrest an emotionally disturbed individual who was actively resisting police officers. Immediately before the challenged use of force, Eugenia had repeatedly screamed at Officer Farmer, advanced toward him, intentionally chest-bumped him, and continued resisting his efforts to detain her. Officer Farmer was therefore not interacting with Plaintiff in a controlled environment; he was actively attempting to complete a lawful arrest while simultaneously maintaining control of an increasingly volatile situation.

14

The circumstances confronting Officer Farmer were further complicated by the presence of multiple individuals inside the residence. While Officer Farmer attempted to restrain Eugenia, Officer Mora was simultaneously occupied addressing Marcelino Santiago, whose escalating conduct required police attention even as Mora attempted to assist with Eugenia's arrest. At the same time, Plaintiff approached Officer Farmer and made repeated physical contact with him while he remained engaged with Eugenia. Whether Plaintiff intended to protect her daughter or simply calm the situation, a reasonable officer in Officer Farmer's position was not required to distinguish with precision between benign conduct and interference with an arrest while he was actively attempting to control a resisting subject. *See Graham*, 490 U.S. at 396-97.

The physical environment likewise bears directly on the reasonableness analysis. The encounter occurred inside a confined kitchen immediately after officers entered a residence in response to a report that an emotionally disturbed individual had threatened suicide with a knife. Upon entering the residence, the officers observed puncture marks in a bedroom door consistent with knife damage and broken glass scattered across portions of the floor. Although Plaintiff emphasizes that she herself was unarmed, the Fourth Amendment requires the Court to evaluate the circumstances confronting Officer Farmer as a whole, not to isolate any single fact. *See Santini*, 795 F.3d at 417 (holding the infringement on the plaintiff's rights was robust where the officers "grabbed, tackled, punched, kicked, and pepper sprayed" him, despite the "scene that the officers were confronted with [being] peaceful at the time of the . . . interaction, and there [being] many officers at the scene."). Here, at the moment force was used, Officer Farmer remained engaged in a physical struggle with an actively resisting individual in a confined space containing multiple civilians whose conduct demanded his attention. Indeed, the body-worn camera recording clearly depicts that Officer Farmer's attention was on Eugenia and not Plaintiff during the encounter.

15

These circumstances correspond closely with the considerations the Third Circuit identified in *Sharrar*. The encounter occurred while Officer Farmer was effecting an arrest; the individual being arrested had already demonstrated violent and combative behavior; officers had reason to believe a knife had recently been present inside the residence; and Officer Farmer was required to contend simultaneously with multiple individuals in a rapidly evolving situation. *See Sharrar*, 128 F.3d at 822. Of particular significance here is the final *Sharrar* factor—the "number of persons with whom the police officers must contend at one time." *Id.* This was not a one-on-one interaction between Officer Farmer and Plaintiff. Rather, Officer Farmer was simultaneously attempting to restrain Eugenia while Plaintiff's tapping was distracting him from the task of arrest and Officer Mora divided his attention between assisting with Eugenia and monitoring Santiago. The Fourth Amendment requires the Court to evaluate Officer Farmer's actions against that complete factual backdrop.

Finally, the Supreme Court has repeatedly cautioned courts against second-guessing split-second decisions made during tense, uncertain, and rapidly evolving encounters. *Graham*, 490 U.S. at 396-97. Here, Officer Farmer was required to decide, within seconds, how best to maintain control of an actively resisting EDP while another individual was distracting him during the arrest and yet another civilian demanded police attention nearby. Viewing those circumstances objectively, the Court cannot conclude that the Fourth Amendment required Officer Farmer to delay effectuating Eugenia's arrest or attempt to determine Plaintiff's subjective intentions before taking reasonable steps to create separation between Plaintiff and attempt to regain control of Eugenia.

16

Accordingly, considering the totality of the circumstances, the Court concludes that Officer Farmer's decision to use limited physical force to move Plaintiff away from the ongoing arrest was objectively reasonable.

### iii. The force employed was proportionate to the circumstances confronting Officer Farmer.

The nature and degree of force employed further support the conclusion that Officer Farmer acted reasonably. The body-worn camera recordings depict Officer Farmer issuing the command "Move" immediately before physically creating separation between Plaintiff and the ongoing arrest. The force was brief, directed solely toward moving Plaintiff away from the immediate struggle, and ceased immediately. The recordings make clear that after the single motion no force is used toward Plaintiff. In contrast to the cases relied on by Plaintiff, here, Plaintiff was not subject to repeated strikes, shoves, punches, kicks, or any continued application of force against Plaintiff after she was separated from Officer Farmer and Eugenia. *See Santini*, 795 F.3d at 417.

The Court does not minimize the seriousness of Plaintiff's injuries. The record establishes that Plaintiff sustained a fractured hip requiring surgery and subsequent rehabilitation. Those injuries are significant, and nothing in this Opinion should be read to diminish their severity or suggest that the Court is unsympathetic to the extent of Plaintiff's injuries. However, the Fourth Amendment inquiry examines the objective reasonableness of the force used—not the extent of the resulting injury, no matter how unfortunate. *See Graham*, 490 U.S. at 396-97. A use of force that is objectively reasonable when employed does not become constitutionally excessive solely because an unforeseen injury proves more severe than anticipated. *See County of Los Angeles v. Mendez*, 581 U.S. 420, 427-28 (2017) (explaining that Fourth Amendment liability turns on whether the force itself was unreasonable). Here, the undisputed evidence demonstrates that Officer Farmer employed a single, brief application of force for the immediate purpose of creating

17

space while completing an active arrest. Under the circumstances confronting him, that level of force was proportional to the legitimate governmental interests at stake.

### iv. *Plaintiff's remaining arguments do not create a genuine dispute of material fact.*

Plaintiff raises several additional arguments that, even when viewed in the light most favorable to her, do not alter the Court's conclusion.

First, Plaintiff argues that Officer Farmer provided no meaningful warning before pushing her. While the body-worn camera recordings indicate that Officer Farmer's command to "Move" occurred immediately before the push, the Fourth Amendment does not impose a categorical requirement that officers provide advance verbal warnings before using reasonable force. Whether additional warnings are feasible depends upon the circumstances confronting the officer. *See Graham*, 490 U.S. at 396-97. Given the rapidly evolving nature of the encounter, the absence of an earlier warning does not render Officer Farmer's conduct objectively unreasonable, particularly here where Eugenia continued to struggle.

Second, Plaintiff emphasizes that Officer Farmer knew she was unarmed and that she was not suspected of committing a crime. Those facts are relevant and the Court has considered them. They do not, however, resolve the constitutional inquiry. The relevant question is not whether Plaintiff herself posed an independent criminal threat, but whether a reasonable officer could use limited force to remove a third party who physically engaged the officer during an active struggle with a resisting EDP. Under the circumstances presented here, the Court concludes that he could.

Third, Plaintiff relies heavily on her age, size, and physical condition. Those characteristics understandably bear upon the unfortunate severity of Plaintiff's injuries. They do not, however, change the objective circumstances confronting Officer Farmer when force was used. The Fourth

18

Amendment required Officer Farmer to respond to events as they unfolded in real time, not with the benefit of hindsight after Plaintiff's injuries became known. *See Graham*, 490 U.S. at 396.

Fourth, Plaintiff disputes whether Officer Farmer reasonably believed weapons remained accessible within the kitchen. Even assuming Plaintiff is correct that Officer Farmer knew Plaintiff herself was not armed, the Court need not determine whether concern over accessible weapons independently justified the force employed. As discussed above, the undisputed circumstances— including Eugenia's active resistance, Plaintiff's physical engagement with Officer Farmer, the confined environment, and the presence of multiple civilians—provided an objectively reasonable basis for Officer Farmer to create physical separation and maintain control of the encounter.

Finally, Plaintiff relies on the opinions of her police practices expert, Glenn Garrels, that Officer Farmer's conduct violated accepted police practices and the New Jersey Attorney General's Use of Force Policy. Expert testimony regarding police practices may assist a jury in understanding law enforcement standards, but it cannot alter the governing Fourth Amendment inquiry, which remains an objective legal question committed to the Court. *See Abraham v. Raso*, 183 F.3d 279, 295-96 (3d Cir. 1999) (explaining that Fourth Amendment reasonableness is governed by the Constitution rather than departmental policies). Because the material facts depicted in the body-worn camera recordings are not genuinely disputed, Mr. Garrels's differing opinion regarding the reasonableness of Officer Farmer's conduct does not preclude summary judgment.

Accordingly, Plaintiff has failed to demonstrate a genuine dispute of material fact as to whether Officer Farmer's use of force violated the Fourth Amendment. The Court therefore concludes that Defendants are entitled to summary judgment on Plaintiff's excessive force claim.

### c. Even If Officer Farmer Violated the Fourth Amendment, He Is Entitled to Qualified Immunity.

Even assuming, *arguendo*, that a reasonable jury could conclude Officer Farmer's use of force violated the Fourth Amendment—which the Court concludes it could not—Officer Farmer would nevertheless be entitled to qualified immunity because Plaintiff has failed to demonstrate that the constitutional right at issue was clearly established on March 22, 2023.

#### i. *The clearly established inquiry must be undertaken with specificity.*

As discussed above, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Mullenix*, 577 U.S. at 12 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). Although a plaintiff need not identify a prior case involving identical facts, existing precedent must have placed the constitutional question confronting the officer "beyond debate." *White*, 580 U.S. at 79 (quotation omitted).

The Supreme Court has repeatedly instructed lower courts not to define clearly established law "at a high level of generality." *Id.* Rather, the inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). That requirement carries particular force in Fourth Amendment excessive force cases, where "the result depends very much on the facts of each case." *Mullenix*, 577 U.S. at 12 (quotation omitted). Accordingly, the Supreme Court has repeatedly reversed denials of qualified immunity where lower courts relied upon generalized excessive-force principles rather than precedent addressing materially similar circumstances. *See Kisela*, 584 U.S. at 104-06; *City of Tahlequah*, 595 U.S. at 12-13; *Rivas-Villegas*, 595 U.S. at 5-8.

The relevant inquiry here, therefore, is not whether it was clearly established that officers may not use excessive force in the abstract. The question is whether, in March 2023, it was clearly

established that an officer violated the Fourth Amendment by physically moving aside a third party who physically engaged the officer while the officer was attempting to effectuate an arrest.

### ii. *Plaintiff identifies no controlling authority placing the constitutional question beyond debate.*

Plaintiff has identified no Supreme Court or Third Circuit decision—and the Court has located none—holding that an officer violates the Fourth Amendment under circumstances materially similar to those presented here. Nor has Plaintiff identified a robust consensus of persuasive authority establishing that such conduct was unconstitutional. *See District of Columbia v. Wesby*, 583 U.S. 48, 63-64 (2018) (explaining that clearly established law ordinarily requires either controlling authority or a robust consensus of persuasive cases). Indeed, the authorities upon which Plaintiff principally relies underscore why qualified immunity applies.

In *Santini v. Fuentes*, the Third Circuit concluded that factual disputes precluded summary judgment where officers allegedly used force against an individual after the circumstances had stabilized and the plaintiff was not physically engaged in an ongoing arrest. 795 F.3d at 420-24. Likewise, in *El v. City of Pittsburgh*, the Third Circuit emphasized that the plaintiff was not confronting officers during the sort of "few tense and dangerous seconds" that characterize rapidly unfolding police encounters. 975 F.3d at 337. Neither decision addressed an officer's use of force against a third party who physically engaged the officer during an active struggle with a resisting arrestee while officers simultaneously managed multiple unfolding confrontations.

Nor do Plaintiff's remaining authorities clearly establish the unlawfulness of Officer Farmer's conduct. Rather, they generally involve force applied after suspects had been secured, force materially greater than that employed here, or circumstances lacking the rapidly evolving and multi-person dynamics confronting Officer Farmer. *See, e.g., Couden v. Duffy*, 446 F.3d 483, 497-98 (3d Cir. 2006) (denying qualified immunity where officers tackled and pepper-sprayed an

21

unarmed, compliant minor who was not resisting, posed no immediate threat, and was not physically interfering with an ongoing arrest); *cf. Kisela*, 584 U.S. at 104-06 (emphasizing that materially distinguishable precedent cannot clearly establish the law for qualified immunity purposes). Simply put, Plaintiff has cited no authority placing "beyond debate" that Officer Farmer's conduct under these particular circumstances violated the Fourth Amendment. *White*, 580 U.S. at 79.

### *iii.* At a minimum, reasonable officers could disagree regarding the lawfulness of Officer Farmer's conduct.

Even assuming Officer Farmer misjudged the amount of force necessary to create space between Plaintiff while he arrested Eugenia, qualified immunity protects officers who make reasonable mistakes while performing their duties in uncertain and rapidly evolving circumstances. *See Pearson*, 555 U.S. at 231. As the Supreme Court has repeatedly recognized, the doctrine provides officers with "breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011).

Here, Officer Farmer confronted an actively resisting emotionally disturbed individual who had already physically confronted him; Plaintiff then physically engaged Officer Farmer while he attempted to complete the arrest; Officer Mora simultaneously divided his attention between assisting with the arrest and monitoring Santiago; and the encounter unfolded in a confined environment over the course of only a few seconds. Under those circumstances, even if another officer might have responded differently, it cannot be said that every reasonable officer would have understood that using a single push to create separation with a third party who was intervening during an arrest violated the Fourth Amendment. *See Rivas-Villegas*, 595 U.S. at 7-8; *City of Tahlequah*, 595 U.S. at 12-13.

22

Accordingly, even assuming Plaintiff could establish a constitutional violation, Officer Farmer would independently be entitled to qualified immunity because the law did not clearly establish that his conduct was unconstitutional under the circumstances confronting him on March 22, 2023. Summary judgment in Officer Farmer's favor is therefore warranted on this independent basis.

### d. Plaintiff's Remaining Claims Fail as a Matter of Law.

#### i. *Plaintiff's Monell claim fails.*

Plaintiff also asserts claims against the City of Vineland and the Vineland Police Department under 42 U.S.C. § 1983, alleging that Officer Farmer's conduct resulted from unconstitutional policies, customs, or failures to train. (Compl. at 4, ¶¶ 2-4.)

A municipality may not be held liable under § 1983 solely because it employs a tortfeasor. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). Rather, municipal liability attaches only where execution of an official policy or custom causes the alleged constitutional deprivation. *Id.* at 694. Moreover, where no constitutional violation has occurred, there can be no municipal liability under § 1983 predicated upon the challenged conduct. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986); *Mulholland v. Gov't Cnty. of Berks*, 706 F.3d 227, 238 n.15 (3d Cir. 2013).

Because the Court concludes that Officer Farmer did not violate Plaintiff's Fourth Amendment rights, Plaintiff's *Monell* claim necessarily fails. Even assuming otherwise, Plaintiff has produced no evidence from which a reasonable jury could conclude that any official policy, longstanding custom, or deliberately indifferent failure to train was the moving force behind the challenged use of force. *See Monell*, 436 U.S. at 694; *City of Canton v. Harris*, 489 U.S. 378, 388-89 (1989); *Forrest v. Parry*, 930 F.3d 93, 105-07 (3d Cir. 2019).[2]

---

[2] Plaintiff concedes that her *Monell* claim fails as a matter of law. (*See* Opp. at 10-11.)

23

Accordingly, summary judgment will be entered in favor of the municipal defendants on Plaintiff's § 1983 municipal liability claim.

### ii. *Plaintiff's claims against the City of Vineland and the Vineland Police Department fail.*

For the same reasons, Plaintiff's claims against the City of Vineland cannot survive summary judgment. Additionally, the Vineland Police Department is not a separate entity subject to suit under § 1983 apart from the municipality itself. Under New Jersey law, a municipal police department is merely an administrative arm of the municipality. *See Bonenberger v. Plymouth Twp.*, 132 F.3d 20, 25 n.4 (3d Cir. 1997); *Padilla v. Twp. of Cherry Hill*, 110 F. App'x 272, 278 (3d Cir. 2004). Accordingly, summary judgment will also be entered in favor of the City of Vineland and the Vineland Police Department.

### iii. *Plaintiff's remaining claims likewise fail.*

Plaintiff also asserts Defendants violated the New Jersey Constitution, together with state-law claims sounding in negligence. Those claims likewise cannot survive summary judgment.

Plaintiff acknowledges that the Court's determination concerning her excessive force claim and the application of qualified immunity are dispositive of her claim for violation of the New Jersey Constitution. (Pl's Opp. Br. at 10-11.) "The New Jersey Civil Rights Act ('NJCRA') was modeled after 42 U.S.C. § 1983, and creates a private cause of action for violations of civil rights secured under the New Jersey Constitutions." *Trafton v. City of Woodbury*, 799 F. Supp. 2d 417, 443 (D.N.J. 2011). The NJCRA is interpreted analogously to § 1983 in cases alleging excessive force in violation of the Fourth Amendment. *See id.* at 443-44; *Perez v. Zagami, LLC*, 218 N.J. 202, 216 (2014). Because Plaintiff has failed to establish a constitutional violation under the Fourth Amendment, her parallel NJCRA claim fails for the same reasons.

Plaintiff's negligence claim fares no better. The New Jersey Tort Claims Act immunizes public employees from liability for discretionary law-enforcement decisions except as otherwise provided by statute. *See* N.J.S.A. 59:3-3; *Bombace v. City of Newark*, 125 N.J. 361, 372-73 (1991). The New Jersey Supreme Court has held that "[t]he same standard of objective reasonableness that applies in Section 1983 actions also governs questions of good faith arising under the Tort Claims Act." *Trafton*, 799 F. Supp. 2d at 443 (quoting *Wildoner v. Borough of Ramsey*, 162 N.J. 375, 387 (2000)). Thus, "if the alleged tort and alleged constitutional violation arise out of the same conduct, and the Court concludes that no constitutional violation occurred because the public employee's actions were objectively reasonable," as here, "the NJTCA's good faith provision applies and bars prosecution of the tort claim." *Id.* at 445.

To the extent Plaintiff asserts derivative state-law claims against the City of Vineland, those claims likewise fail because Officer Farmer committed no underlying tort and because Plaintiff has identified no independent basis for municipal liability under the New Jersey Tort Claims Act. *See* N.J.S.A. 59:2-2(a); *Velez v. City of Jersey City*, 180 N.J. 284, 290-91 (2004).

Accordingly, Defendants are entitled to summary judgment on all remaining state-law claims.

## V.  CONCLUSION

For all the foregoing reasons, Defendants' Motion for Summary Judgment (Dkt. No. 54) will be **GRANTED** in its entirety. Judgment will be entered in favor of Defendants City of Vineland, the Vineland Police Department, and Officer Kenneth A. Farmer on all counts of the Complaint. An appropriate Order accompanies this Opinion.

Dated: July 27, 2026

KAREN M. WILLIAMS
UNITED STATES DISTRICT JUDGE